United States District Court
Southern District of Texas
**ENTERED**
September 30, 2016
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHUONG DUONG TONG, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  4:10-2355 |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM  AND  ORDER  DENYING IN PART
## PETITION  FOR  WRIT  OF  HABEAS  CORPUS

Petitioner Chuong Duong Tong is a Texas death row inmate.  This case is before the Court on Tong's Amended Petition for Writ of Habeas Corpus (Doc. # 57),  and Respondent Lorie Davis' Second Amended Motion for Summary Judgment (Doc. # 59).   Having carefully considered the Amended Petition, the Second Amended Summary Judgment Motion, Tong's Reply to the motion, all the arguments and authorities submitted by counsel, and the entire record, the Court is of the opinion that Davis' Second Amended Motion for Summary Judgment will be **granted in part and denied in part**, and Tong's Amended Petition for Writ of Habeas Corpus should be **denied in part**.

## I.     BACKGROUND

On April 6, 1997, Houston police officer Tony Trinh was working at Sunny's, a Houston convenience store owned by Trinh's parents.  16 Tr. at 16-17.[1]  Tong entered Sunny's, and approached Trinh, who was working behind the counter.  Tong held a Glock

---

[1]        "Tr." refers to the transcript of Tong's trial.

17 semi-automatic handgun.  *Id.* at 164.  Tong demanded Trinh's wallet and jewelry.  While Trinh was handing over his jewelry, Tong attempted to open the cash register.  Trinh then identified himself as a police officer, showed Tong his badge, and told Tong that he 'was not going to get away with this."  Tong shot Trinh once in the head at close range, took Trinh's jewelry, and fled to a waiting car.  *Id.* at 165.  Tong took the gun apart and disposed of the components in several storm drains.  SX 4, 43.[2]

Several days later, Tong asked his roommate, Hoa Huu Than, a/k/a "Too Short," to sell some of Trinh's jewelry.  16 Tr. at 119-20.  After doing so, Than became suspicious that the jewelry might be Trinh's.  When he asked Tong, Tong threatened him if he said anything about the jewelry.  *Id.* at 124-25.

Several months later, Tong was arrested for capital murder.  *Id.* at 138-39.  He gave police a statement detailing the robbery and shooting.  *Id.* at 142-43, 149, 155; SX 4.  In the statement, Tong claimed that he accidentally shot Trinh while jumping over the counter.  SX 4.  He later showed police where he disposed of the handgun components.  17 Tr. at 177-82.

While in a jail holding tank, Tong told a fellow inmate, Stephen Mayeros, why he was in jail.  Mayeros asked Tong how close he was when he shot Trinh, and Tong responded by touching his finger to Mayeros's forehead and saying "bang."  18 Tr. at 17-18.  When Mayeros asked Tong if he felt bad about killing Trinh, Tong replied that he felt terrible and cried himself to sleep, and then laughed.  *Id.* at 19.  Later, when a police officer was kneeling in front of Tong preparing Tong's restraints for transport, Tong placed his fingers in the

---

[2]     "SX" refers to the State's trial exhibits.

shape of a pistol, pointed them at the officer's head, and mouthed the word "bang." *Id.* at 21-23.

At trial in 1998, Tong gave an alibi defense, testifying that he was asleep with his girlfriend at the time of the murder, and that he had never been to Sunny's. 17 Tr. at 92-94. He claimed that he was induced and coerced to confess by promises of lesser charges and threats by police officers. *Id.* at 91-93, 109-10.   The jury found Tong guilty of capital murder on the alternative theories that he intentionally killed Trinh, a police officer performing his official duties, and/or that he intentionally killed Trinh during the course of robbing or attempting to rob Sunny's. SH at 639.[3]

During the penalty phase, the State presented evidence that Tong was arrested for stealing, and had numerous disciplinary problems, during high school. Efforts to counsel Tong were unsuccessful due to Tong's lack of remorse.   He got in trouble for theft, destruction of property, sexual harassment, and assault.   He was eventually expelled from school due to concerns that he posed a threat to the safety of other students. 19 Tr. at 59-83.

During the penalty phase, the State also presented evidence of other incidents.   The first was that, about a month after the murder, Tong took part in a bank larceny involving $400,000. *Id.* at 92-118.  Also, two days before the Trinh incident, Tong and an accomplice broke into the home of Vincent and Hannah Lee.   Mrs. Lee was at home with her sick toddler, Christina.   Tong tied Mrs. Lee up, put a gun to her head, and told her he was going to take all of her money and then kill her.   Mr. Lee came home during the robbery.   Tong and

---

[3]       "SH" refers to the transcript of Tong's state habeas corpus proceeding.

3

his accomplice heard Mr. Lee enter and told Mrs. Lee that they would kill her if she made any noise.  Tong approached Mr. Lee with a gun.  When Mr. Lee reached for the gun, Tong shot him.  Tong dragged Mr. Lee into the living room, where Mrs. Lee and Christina were held, threw him to the floor, and threatened to kill him.  As he was leaving, Tong stated that he was "going to kill all of you" and began firing toward the family.  He shot Christina in the leg, and hit Mr. Lee with two more shots.  Tong laughed after shooting the Lees and left.  19 Tr. at 237-58.

Tong's father, Hoang Tong, testified that he had had marital problems.  Because of this, he left Vietnam with Tong when Tong was three years old.  They moved to the Phillines for approximately nine months.  One day, Hoang found Tong standing in the water near the beach because he missed his mother and wanted to swim back to Vietnam to see her.  20 Tr. at 19-24.

The trial record revealed that Tong had a difficult childhood.  Tong and his father moved to Germany.  Tong lived briefly in one foster home, then in an orphanage, and eventually moved into another foster home, where he lived with Jim and Gabby Wyatt for three years.  During that period, Hoang said he was going on a vacation to the United States, but never returned to Germany, apparently abandoning Tong.  Eventually, after Tong became a serious discipline problem, the Wyatts determined that they could no longer handle him. The Wyatts were able to get in touch with Hoang, and Jim Wyatt brought Tong to Houston. Hoang took informal custody of Tong and they lived together with other family until Hoang left Tong again.  Tong lived with extended family until he was 21 years old.  His relationship

4

with his father was very strained.  *Id.* at 26-88.

Tong's uncle testified that Tong had trouble communicating when he first arrived because he spoke only German.  Tong was unhappy because he missed the Wyatts and his own mother.  *Id.* at 41-49.

Jim Wyatt testified that he met Tong when Tong and his father lived in a Red Cross refugee home in Germany.  He testified that Hoang was not an attentive father and was a very severe disciplinarian.  The Wyatts took Tong in.  For some time, he did well living as part of their family.  However, when Tong returned from weekend visits with his father, he was subdued.  After his father went to the United States, Tong began having difficulties in the Wyatt home.  Eventually, the Wyatts decided to send Tong to live with his family in the United States.  *Id.* at 68-88.

The jury found that there is a probability that Tong would commit future acts of criminal violence posing a conmtinuing threat to society, and that the mitigating evidence did not warrant imposing a life sentence.  SH at 639-40.  Accordingly, on March 11, 1998, the trial court sentenced Tong to death.  *Id.* at 640.

The Texas Court of Criminal Appeals ("TCCA") affirmed Tong's conviction and sentence.  *Tong v. State*, 25 S.W.3d 707 (Tex. Crim. App. 2000).  The TCCA denied his application for a writ of habeas corpus.  *Ex Parte Tong,* No. WR-73377-01, 2009 WL 1900372 (Tex. Crim. App. July 1, 2009).

Tong filed his initial federal petition for a writ of habeas corpus on July 1, 2010.  Respondent moved for summary judgment on April 22, 2011.  Tong amended his petition

on September 13, 2011.  Respondent filed an amended motion for summary judgment on December 13, 2011.

On September 6, 2012, this Court stayed proceedings to allow Tong to file a subsequent writ in state court.  On May 22, 2013, the TCCA dismissed Tong's subsequent writ as an abuse of the writ.  *Ex Parte Tong*, WR-71,377-02, 2013 WL 2285455 (Tex. Crim. App. May 22, 2013).

After Tong's return to federal court, this Court granted Tong's motion for additional counsel, recognizing that the Supreme Court's recent decision in *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), mandated a review of whether ineffective assistance of counsel had occurred in the habeas process, thereby potentially creating a conflict of interest for prior counsel.  On January 27, 2014,  this Court appointed new counsel to represent Tong.

Tong filed his second amended petition (entitled "Amended Petition For Writ Of Habeas Corpus After Return From State Court" (Doc. # 57)) on October 17, 2014, Respondent moved for summary judgment on December 19, 2014, and Tong responded to the motion on January 30, 2015.  The parties filed supplemental briefs in June and July 2015, and in February and March 2016.

## II.    APPLICABLE LEGAL STANDARDS

### A.    The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).

6

Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal

law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999).  A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence."  *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc); *see also Pape v. Thaler*, 645 F.3d 281, 292-93 (5th Cir. 2011).  The focus for a federal court under the "unreasonable application" prong is "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  *Id.* (quoting *Neal*, 239 F.3d at 696, and *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'")

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997).  This Court may only consider the factual record that was before the state court in

determining the reasonableness of that court's findings and conclusions. *Cullen v. Pinholster*, 563 U.S. 170 (2011). Review is "highly deferential," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), and the unreasonableness standard is "difficult [for a petitioner] to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

### B.      Summary Judgment  Standard in Habeas Corpus Proceedings

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). This principle is limited, however; Rule 56 applies insofar as it is consistent with established habeas practice and procedure. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (citing Rule 11 of the Rules Governing Section 2254 Cases). Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party. *See id.* However, in a habeas proceeding, unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" regarding the state court's findings of fact, those findings must be accepted as correct. *See id.* Thus, the Court may not construe the facts in the state petitioner's favor where the prisoner's factual allegations have been

9

adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness in 28 U.S.C. § 2254(e)(1) should not apply. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997).

## III.   ANALYSIS

Tong's petition raises sixteen categories of claims for relief, with some of those containing subclaims. They are addressed in turn below.

### A.   Jury Voir Dire

At the beginning of jury selection, the trial judge, over prosecution objection, informed defense counsel that he would allow the defense unlimited peremptory strikes. After jury selection began, and after Tong struck twenty five jurors and there were ten seated, the trial court changed course, and announced that Tong had used all his peremptory challenges and would have to challenge additional jurors for cause before the court would consider allowing another peremptory strike. Tong wanted to excuse one juror who ended up on the jury. He now contends that the trial court's change in procedure denied him due process and effective assistance of counsel. Respondent argues that this claim is procedurally defaulted.

#### 1.   Procedural Default

The procedural default doctrine may bar federal review of a claim. "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state

procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).  The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 424 (1991).  If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may consider the merits of the claim. *Barr v. Columbia*, 378 U.S. 146, 149 (1964).  An important consideration in determining whether an "adequate" state law ground exists is the application of the state law ground to identical or similar claims. *Amos v. Scott*, 61 F.3d 333, 340-41 (5th Cir. 1995).  The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question. *Howlett v. Rose*, 496 U.S. 356, 366 (1990). If the state court decision rests on federal law, then there is no bar to federal habeas corpus review.

11

> [W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983); *see also Coleman v. Thompson*, 501 U.S. 722 (1991) (applying the presumption in the context of habeas).

Tong raised a claim concerning jury voir dire on direct appeal. The TCCA rejected the claim as inadequately briefed. *Tong*, 25 S.W.3d at 710. The Fifth Circuit recently made clear that a dismissal for inadequate briefing is an independent and adequate state procedural ground.

> A survey of the TCCA's capital sentencing jurisprudence reveals that it regularly rejects claims, both on direct and postconviction review, on the basis that these claims are inadequately briefed . . . . [W]e hold now that under the prevailing standards, Texas's rules have been regularly followed by its courts, and applied to the majority of similar claims. . . . Our sister courts of appeal, in addressing analogous provisions from other states, have likewise found them to act as independent and adequate state procedural bars. *See House v. Hatch*, 527 F.3d 1010, 1029–30 (10th Cir. 2008) (holding that New Mexico's requirement of adequate briefing is an independent and adequate procedural bar to federal habeas relief); *Clay v. Hatch*, 485 F.3d 1037, 1040–41 (8th Cir. 2007) (holding that Arkansas's proper abstracting rule is an independent and adequate procedural bar to federal habeas relief).

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012). *Roberts* thus makes it clear that the TCCA's dismissal of this claim as inadequately briefed constitutes a procedural default.

Tong argues that the TCCA did not regularly apply this bar at the time it decided Tong's appeal. His argument, however, cites only one TCCA case in support, and cites only a dissent in that case. Tong's argument on this issue is unconvincing. Therefore, this Court

can address the claim only if Tong demonstrates cause and prejudice, or that failure to address the claim will result in a fundamental miscarriage of justice.

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. Cause can be shown, for example, by demonstrating that the evidence needed to properly raise a claim was suppressed by the State.

The fundamental-miscarriage-of-justice exception is limited to the following circumstances: (1) where the petitioner can show that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense," *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quotation omitted); or (2) in the capital sentencing context, where the petitioner can show "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). Importantly, the fundamental-miscarriage-of-justice exception applies only where a petitioner supplements a constitutional claim with a colorable showing of factual, as opposed to legal, innocence. *See McCleskey v. Zant*, 499 U.S. at 495 (quoting *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986)); *accord Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Tong does not contend that he is factually innocent of capital murder, or that he is legally ineligible for the death penalty. He does argue that he received ineffective assistance of appellate counsel, and that this constitutes cause for his default. Ineffective assistance of

counsel can constitute cause for a procedural default only if the ineffective assistance of counsel claim is, itself, exhausted in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Tong did raise a claim in his state habeas application that appellate counsel was ineffective for failing to adequately brief the voir dire issue. The state habeas court found that the trial court did not err, and that counsel was therefore not ineffective for failing to adequately brief the issue.

Tong raises a separate, freestanding, claim of ineffective assistance of appellate counsel. As discussed in more detail in the analysis of that claim, *see* § II. J., *infra*, Tong does not show that counsel was constitutionally ineffective. Because he fails to demonstrate ineffective assistance of counsel, he has no cause for his procedural default of the voir dire claim, and this Court cannot grant relief. In any event, as discussed below, Tong cannot show prejudice from his appellate counsel's allegedly deficient performance.

## 2. <u>Prejudice Caused by the Change in Procedure</u>

Tong argues that he relied on the trial court's promise of unlimited peremptory challenges in formulating his jury selection strategy, and that the change in procedure rendered the process unfair and handicapped counsel. The state habeas court found that Tong did not rely on any such promise, because he challenged four jurors for cause during the time he believed he had unlimited peremptory challenges. SH at 552. Moreover, Tong fails to identify any peremptory challenge he would not have used had he known that he had a limited number of such challenges available to him. Finally, the state habeas court found that the one juror Tong wanted, but was unable, to excuse, was not challengeable for cause.

*Id.*  The state habeas court found insufficient evidence that the juror was prejudiced or otherwise unfit to serve as a juror. SH at 552.

"'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)).  Tong does not demonstrate such reasonable probability.

Specifically, Tong fails to demonstrate: (1) that he would have conducted voir dire differently had he known he did not have unlimited peremptory challenges; or (2) that the one juror affected by the trial court's change was in any way biased or unqualified to serve. He therefore fails to demonstrate a reasonable probability that the outcome would have been different if the trial court had not changed procedures, and thus fails to demonstrate that this claim would have succeeded on direct appeal even if the voir dire claim had been adequately briefed.  Moreover, there is no constitutional right to peremptory challenges.  *See*, *e.g.*, *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).  Tong therefore both fails to show cause for his procedural default, and fails to demonstrate any constitutional error.  The due process claim thus fails both on the merits, and on the basis of the procedural default.[4]

## B.  <u>Confession-Related Claims</u>

---

[4]  Tong argues that the change in voir dire procedure constitutes structural error.  This argument is unavailing.  A finding of structural error does not excuse a procedural default or result in a presumption of error on the merits.  It simply means that any such error, once demonstrated, necessarily affected the trial and is not subject to harmless error analysis.

Tong made at least three statements confessing to the murder.  He now raises three claims asserting that his confessions were illegally obtained and should not have been admitted into evidence at trial.

### 1.    **Procedural Default**

The state habeas court found that Tong failed to raise his confession-related claims on direct appeal, and that they are therefore defaulted.  3 SH at 576.  Tong again claims that ineffective assistance of appellate counsel constitutes cause for the default.  He also claims that he was misled about his rights by a state magistrate, and that this also constitutes cause.  As discussed below, Tong's underlying claims are without merit.  Therefore, at a minimum, Tong fails to establish cause to excuse his procedural default.

### 2.    **Right to Counsel**

First, Tong gave a typewritten statement to M.F. Waters, a Houston police officer, at 1:45 a.m. on August 14, 1997.  SX 4.  He next gave a tape-recorded statement about nine hours later to Officer Todd Miller.  SX 43.  Both of these statements pertain to the Trinh murder and were admitted during the guilt-innocence phase of his trial.  The same night of his arrest, Tong gave a third statement.  SX 50.  This statement concerned an extraneous offense and was admitted during the penalty phase.  Tong now claims that he invoked his right to counsel during the first interview, but that the police improperly continued to question him.

The state habeas court found that Officer Waters informed Tong of his *Miranda* rights and that Tong understood and waived his rights before making his statements.  3 SH at 557-

58. The court also found that Tong never requested an attorney during the interview.  *Id.* The court specifically found that Tong's *post hoc* claim that he requested counsel was "unpersuasive, suspect, and unsupported."  SH at 560-61.

In support of his claim, Tong notes that the police could have recorded his interviews, but did not; that they could have taken him to a magistrate sooner than they did; that police expressed some concern that he missed his *Miranda* warnings; and that he asked the magistrate "when" counsel would be appointed.  As noted above, where the state court has made findings of fact, Tong must rebut such findings by clear and convincing evidence.  His "evidence" does not meet that standard.

First, Tong does not claim that the police were required to record the interview.  This theory, therefore, does not support habeas relief.

Second, Tong claims that he could have been brought before a magistrate prior to 10:53 a.m. the morning after his arrest, when he gave his statement.   This claim does not support his claim for relief.  Texas law requires that a suspect be brought before a magistrate "without unnecessary delay."  TEX. CODE CRIM. PROC. ANN. art. 15.17(a).  Officer Miller testified that suspects were brought to the magistrate at regular intervals based on inmate volume.  Tong makes no factual showing that a magistrate was available before he gave his first statement at 1:45 a.m., or that the police violated their normal procedure regarding the timing of Tong's appearance.  Tong's attempt to impute some nefarious motive to police actions is based entirely on speculation and surmise.  It does not rise to the level of clear and convincing evidence.

17

Tong's claim that police thought he "may have missed" his *Miranda* warnings is not supported by the record.  He claims that officer Miller testified that Tong "may have missed" his *Miranda* warnings.  Miller, however, specifically testified at trial that he read Tong his *Miranda* warnings and that Tong told Miller that he understood them and was willing to waive them.  17 Tr. at 169-70.  Miller later testified that the police regularly brought suspects before a judge for their magistrate warnings, but that Tong "may have missed that sort of warning" because he was being interviewed.  As a result, the police brought Tong before the magistrate by himself to make sure that he received his magistrate warnings.  *Id.* at 177.  It appears that the warnings Miller thought Tong might have missed were the magistrate warnings given to a group of suspects, not the *Miranda* warnings given by the police to Tong.[5]

Finally, Tong places great significance on the fact that he asked the magistrate "when" counsel would be appointed.  He treats this as proof positive that he previously asked for counsel.  The Court is unpersuaded.  This statement is ambiguous.  It shows merely that Tong was aware that he had a right to counsel – something he would have known from being given his *Miranda* warnings by the officers close in time to his arrest and before he was questioned.  Tong's "evidence" does not meet the clear and convincing standard necessary to rebut the state court findings that he was given his *Miranda* warnings in a timely manner and he knowingly waived the right to counsel.  Because those findings are not unreasonable based

---

[5]    The officer testified that inmates from the jail are brought before a magistrate at regular intervals "in order for their rights and warnings to be read," and that Tong "may have missed that sort of warning."  17 Tr. at 176-77.

on the record, they are entitled to deference.  Tong therefore fails to demonstrate that the police violated his Fifth Amendment right to counsel.  Therefore, notwithstanding any procedural default, Tong is not entitled to relief on his Fifth Amendment right to counsel claims.

### 3.   Promises of Leniency

Tong next claims that the police induced him to confess by telling him that he would be charged with manslaughter instead of capital murder if he cooperated.  At trial, officers Waters and Miller both testified that they told Tong no such thing.  17 Tr. at 138, 176.  Officer C.A. McClelland witnessed Tong sign his written statement.  He explained that it was standard procedure for the officers who took the statement to leave the room before the suspect signs it so that the suspect does not feel pressured to sign.  *Id.* at 149-50.

McClelland testified that he asked Tong a series of questions to insure that Tong was signing his statement voluntarily.  Among these questions was whether Tong was promised anything before making his statement.  Tong answered that he was not.  *Id.* at 150.

The state habeas court found that the police did not make any promises, that Tong specifically denied receiving any promises, and that Tong's post-conviction affidavit claiming otherwise was "unpersuasive, suspect, and unsupported . . . ."  SH at 558-61.  The record supports this conclusion, and the state habeas court findings are entitled to deference.

### C.   Right to Counsel at Pretrial Lineup

Tong next contends that he was denied his Sixth Amendment right to counsel at the pretrial lineup.  He again alleges that he requested counsel during interrogation – an assertion

that the state habeas court rejected and, as noted above, that finding is entitled to deference. Tong now asserts that he also requested counsel at the pretrial lineup, but that his request was denied. He further contends that the lineup was improperly suggestive. He repeats his assertions, also rejected above, that the officers delayed bringing him before a magistrate, and that his question as to "when" he would be appointed counsel proves that he previously requested counsel.

Respondent argues that Tong is raising two separate claims, a Sixth Amendment right to counsel claim, because the lineup was an advanced stage of an adversary proceeding, and a Fifth Amendment right to counsel based on Tong allegedly invoking his right at the lineup. Respondent argues that the Fifth Amendment claim was never presented to the state courts and is thus unexhausted and procedurally defaulted. Tong clarifies, however, that he is raising only a Sixth Amendment claim. *See* Reply to Motion for Summary Judgment (Doc. # 60), at 45.

The Sixth Amendment right to counsel attaches when "a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Tong argues that the adversary criminal proceedings were already underway because he was arrested pursuant to a probable cause warrant and was a suspect in the Trinh murder.

In *Kirby v. Illinois*, 406 U.S. 682 (1972), the Supreme Court reiterated prior holdings that the Sixth Amendment right to counsel attaches upon the commencement of adversary

judicial proceedings.  In *Kirby*, as in this case, the petitioner was arrested and placed in a pre-arraignment lineup, where he was identified as the man who robbed the witness on the street the day before.  Kirby argued that the lineup, conducted without counsel, violated his Sixth Amendment rights.  The Supreme Court disagreed, declining "to import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings." *Id.* at 690.

The state habeas court relied on *Kirby* in finding that the Sixth Amendment right to counsel had not yet attached at the time of the lineup.  *See* SH at 575.  Tong argues that this was an unreasonable application of *Kirby* because he was arrested under a probable cause warrant, was clearly a suspect and, Tong alleges, the police delayed in bringing him before a magistrate.  The extreme factual similarity between Tong's case and *Kirby*, however, makes the state habeas court's application of *Kirby* to this case reasonable.  Therefore, under the AEDPA, this Court must defer to the state habeas court's conclusion that the lineup did not violate Tong's Sixth Amendment right to counsel.

### D.    Admission of Lineup Identification Evidence at Trial

Tong next contends that he was denied his Fifth and Fourteenth Amendment rights when the trial court admitted evidence of a witness' identification of Tong from the lineup.  Tong argues that the lineup evidence was unreliable.

At a pretrial lineup, Arthur Alvear identified Tong as the man he saw running from the scene of the Trinh shooting immediately after Trinh was shot.  Alvear and his girlfriend lived in an apartment across the street from the crime scene.  Alvear testified that he did not

hear a gunshot and was unaware that a robbery had occurred, but remembered seeing Tong running from the scene.  17 Tr. at 7-10, 21.

Tong challenges the reliability of eyewitness testimony in general, and Alvear's identification in particular, claims that the lineup was improperly suggestive, and argues that Alvear's in-court identification was not independently reliable.  Respondent argues that these claims are unexhausted and without merit.

### 1.  <u>Exhaustion</u>

Respondent acknowledges that Tong presented identification-related claims to the state courts, but argues that his state court claims were not based on any evidence, whereas his current claims rely on expert affidavits, witness statements, and references to articles. Respondent further argues that the state court claims lacked Tong's current discussion of the general unreliability of eyewitness identification, of "estimator variables," of cross-racial identification, or of the general unreliability of lineups, and the claims were not supported by articles, expert opinion, or eyewitness statements.

AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court

all grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."). A petitioner fulfills the exhaustion requirement if "all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition. *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000).

Tong's state writ application raised the same legal arguments presented here. *See* SH at 54-60. Where new evidence merely supplements, rather than fundamentally alters, the claim, then the new evidence does not render the claim unexhausted. *See*, *e.g.*, *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). Because the same claims, relying on the same underlying facts, were presented to the Texas state courts, Tong's identification-related claims are exhausted.

### 2. Procedural Default

Respondent also argues that this claim is procedurally defaulted because the state habeas court found the claim defaulted on the grounds that Tong did not raise it on direct appeal. As noted above, a state procedural bar may constitute a bar to federal review.

Tong argues that the state court did not clearly and expressly state that it was relying on a procedural bar because the state court also addressed the merits of Tong's claim. The

23

state court stated, however, that "[b]ecause [Tong] failed to raise on direct appeal his instant habeas claim challenging the lineup and identifications by witness Arthur Alvear, the applicant is procedurally barred from raising the claim in the instant proceeding." SH at 575. This statement of procedural bar was unambiguous. The Supreme Court has noted that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).  Thus, this claim is procedurally defaulted.

Tong argues that he can show cause and prejudice, however, because appellate counsel rendered ineffective assistance.  As discussed below, however, the state habeas court's alternative merits analysis reached a reasonable conclusion based on a reasonable application of controlling precedent to the facts of this case.  Therefore, regardless of whether appellate counsel was ineffective, Tong has not shown prejudice and is not entitled to relief.

### 3. <u>Suggestive Lineup</u>

Tong argues that Alvear's lineup identification was unreliable because the lineup was overly suggestive. He notes that Alvear participated in two lineups, and that the lineups were "simultaneous" rather than "sequential."  A simultaneous lineup is one in which the witness views all of the lineup participants at the same time.  A sequential lineup is one in which the witness views each participant individually.  Tong cites research finding that witnesses in simultaneous lineups are more likely to choose the participant who looks most like the person

they saw rather than choosing one who actually bears a close resemblance to the person the witness saw.  In a sequential lineup, because the witness is seeing only one person at a time, the witness is more likely to choose only a participant who actually looks like the person the witness observed at or fleeing the scene, rather than making a comparative choice and choosing the one who looks most like that person.

It is well-established that an identification resulting from an unduly suggestive lineup must be suppressed.  *See, e.g., Stovall v. Denno*, 388 U.S. 293, 298 (1967).  The Supreme Court gave examples of unduly suggestive identification procedures in *United States v. Wade*, 388 U.S. 218 (1967).

> In a Canadian case . . . the defendant had been picked out of a lineup of six men, of which he was the only Oriental. In other cases, a black-haired suspect was placed among a group of light-haired persons, tall suspects have been made to stand with short nonsuspects and, in a case where the perpetrator of the crime was known to be a youth, a suspect under twenty was placed in a lineup with five other persons, all of whom were forty or over.

> Similarly state reports, in the course of describing prior identifications admitted as evidence of guilt, reveal  numerous instances of suggestive procedures, for example, that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.

> The potential for improper influence is illustrated by the circumstances, insofar as they appear, surrounding the prior identifications in the three cases we decide today. In the present case, the testimony of the identifying witnesses elicited on cross-examination revealed that those witnesses were taken to the courthouse and seated in the courtroom to await assembly of the lineup. The courtroom faced on a hallway observable to the witnesses through an open

door. The cashier testified that she saw Wade "standing in the hall" within sight of an FBI agent. Five or six other prisoners later appeared in the hall. The vice president testified that he saw a person in the hall in the custody of the agent who "resembled the person that we identified as the one that had entered the bank."

The lineup in *Gilbert* [*v. California*, 388 U.S. 263 (1967)], was conducted in an auditorium in which some 100 witnesses to several alleged state and federal robberies charged to Gilbert made wholesale identifications of Gilbert as the robber in each other's presence, a procedure said to be fraught with dangers of suggestion. And the vice of suggestion created by the identification in *Stovall*, *supra*, was the presentation to the witness of the suspect alone handcuffed to police officers. It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police.

*Wade*, 388 U.S. at 232–34 (footnotes omitted).

Courts have also found that differences in age or accent (if the participants are required to speak) among lineup participants can, under certain circumstances, render a lineup overly suggestive. *See, e.g.*, *Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1978); *see also Milton v. Procunier*, 744 F.2d 1091, 1102 (5th Cir. 1984) (finding that a lineup in which some of the participants, including the suspect had facial hair and the participants ranged in height from 5'7" to 5'11" was not improperly suggestive).

The state habeas court found that Alvear described the suspect as an Asian male, approximately five feet seven or five feet eight inches tall, with hair cut short on the sides. SH at 555. The Court found that there was a one inch difference between Alvear's description and Tong's actual height. *Id.* The court found that the other participants in the lineup were Asian males with short dark hair, that three of the participants, including Tong, had bangs over their foreheads, that Tong was neither the youngest nor oldest, the heaviest

nor lightest, the shortest nor tallest participant, that none of the participants were more than three inches shorter or one inch taller than Tong, and that none of the other participants had a grossly dissimilar appearance from Tong. *Id.* at 555-56. This Court has reviewed a video of the lineup and finds the state habeas court's description accurate.

The state habeas court further found that Alvear was told prior to the lineup that the person he saw running from the crime scene might or might not be in the lineup and that he was under no obligation to pick anyone. The officer conducting the lineup did not know who Tong was or his position in the lineup, and so could not give Alvear any cues about who to pick. *Id.* at 556. The court further found that the lineup was not improperly suggestive because Alvear had a good opportunity to view Tong fleeing from the crime scene, Alvear was attentive at the time, his description of the suspect was similar to Tong's actual appearance, he was positive in his identification, and the time elapsed between the crime and the lineup was not unduly long. *Id.*

Tong now cites expert evidence, articles, and research supporting an argument that the four month time lapse between the murder and the lineup, the cross-racial nature of the identification, the distance (approximately 85 feet) from which Alvear observed the person fleeing the scene, and the fact that Alvear was unaware that anything significant had just occurred and argues that these circumstances undercut the reliability of Alvear's identification. Tong also points to evidence that Alvear's confidence in his identification is not a valid indication that it is correct or reliable. This evidence was not presented to the state habeas court. In determining whether the state court's conclusion was reasonable, this

Court may consider only the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

None of Tong's current evidence was before the state habeas court. That court's conclusion rested on the basic facts of Tong's lineup, and existing precedent describing examples of impermissibly suggestive lineups, such as those quoted above. While Tong now argues strenuously that recent scholarship demonstrates that some of the factors the state habeas court cited do not, in fact, support a finding that the identification was reliable, this scholarship was not before the state habeas court. In light of the record before the state habeas court, that court's conclusion that the lineup was not impermissibly suggestive, and that Alvear's lineup identification was admissible, was not unreasonable. As such, this Court must defer to that conclusion. Because the state habeas court's conclusion that the lineup was not impermissibly suggestive was not unreasonable, Tong's separate claim that Alvear's in-court identification was unreliable does not state a viable independent ground for relief. *See Perry v. New Hampshire*, 132 S.Ct. 716, 726 (2012) (holding that "[t]he due process check for reliability . . . comes into play only after the defendant establishes improper police conduct").

Tong's evidence and argument raise concerns about the reliability of Alvear's identification but, under controlling precedent, this Court cannot say that the state courts' resolution of the issue was unreasonable. Therefore, under AEDPA, this Court cannot grant relief.

### E.   Suppression of Exculpatory Evidence

Tong next contends that the State failed to disclose deals it offered to two prosecution witnesses, Stephen Mayeros, and Hoa Huu "Too Short" Than.  Mayeros testified that he was in a holding cell with Tong when Tong made incriminating statements.  Than testified that Tong gave him Trinh's jewelry to sell.

### 1.   <u>Stephen Mayeros</u>

The record establishes that Mayeros ran a house cleaning service, and had various police officers as clients.  Mayeros was arrested in mid-August 1997 for driving with a suspended license.  He was placed in a holding cell with Tong.  Mayeros testified that he asked Tong how close he was when he shot Trinh.  Tong put his finger to Mayeros' forehead and said "Bang."  18 Tr. at 18.  When Mayeros asked Tong if that made him feel bad, Tong replied that he cried himself to sleep every night, and then laughed.  *Id.* at 19.  Tong also told Mayeros that he took a bracelet from the victim.

Mayeros further testified that, about a week later, he mentioned this conversation to one of his police officer clients, Officer Douglas Harborson.  Harborson put Mayeros in contact with someone from the Houston Police Department homicide division.  Mayeros gave a statement to the police.  Ten days later, the charges against Mayeros were dropped.

Tong now asserts that he has since learned that Mayeros was in jail on his fourth charge of driving with a suspended license, that Mayeros received jail time on each prior occasion, and that he was also on probation for an assault conviction in Fort Bend County. Before trial, Tong requested information about the criminal records of State's witnesses, and about any deals between the State and any witness.  The State did not disclose any

information about Mayeros' criminal history or any deal with Mayeros.  Tong's trial counsel

also testified that he reviewed the State's file on numerous occasions and never found any

such information.  SH at 178-79.

Tong now contends that Mayeros admitted to Tong's prior habeas counsel, John

McFarland, that he got a deal for testifying against Tong.  Amended Petition, Exh. 3.

McFarland states:

> Mr. Mayeros admitted that he was told that "if [his] testimony against Mr.
> Tong was helpful toward securing Mr. Tong's conviction, the Harris County
> district attorney could see no reason why he would need to prosecute Mr.
> Mayeros for a driving-without-a-license offense."  Mr. Mayeros stated that he
> was also told that if his testimony was not helpful, the district attorney could
> see no reason why he would not prosecute Mr. Mayeros for the offense.

*Id.*

### 2. <u>Than</u>

Than testified that Tong asked him to sell some jewelry a few days after the Trinh

murder. Than stated that he agreed and took a bracelet and a diamond ring to a pool hall, sold

the items, and gave the money to Tong.  Than testified that he only realized later, after seeing

a description of the items in a newspaper, that the items were Trinh's.  When he asked Tong

about this, Tong told him not to say anything.

Tong argues that Than was on two felony probations at the time he sold the jewelry,

yet was not charged with any crime in connection with the sale.  Tong also asserts that Than

was the only co-conspirator in a recent bank larceny who was not indicted.  Tong also

describes as not credible the prosecutor's assertion that "Than could not have been

prosecuted for possession of the jewelry, because there was no evidence Than knew the

jewelry was stolen at the time he possessed it."

### 3.     Suppression of Exculpatory Evidence

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The question is not whether the result would have been different. Rather, it is whether given the non-disclosures of material evidence the verdict is less worthy of confidence. In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it. Rather, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court emphasized four aspects of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Id.* at 434. The question is not whether the defendant would have received a different verdict with the disclosed evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* A "reasonable probability of a different result" is shown when the suppression "undermines confidence in the outcome of the trial." *Id.*

Second, the materiality test is not a test of the sufficiency of the evidence. The defendant need not demonstrate that after discounting the inculpatory evidence by the undisclosed evidence that there would not have been enough evidence to sustain the conviction. Rather, a *Brady* violation is established by showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Third, harmless error analysis does not apply. *Id,* Fourth, "materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item." *Id.* at 436.

### a.    Procedural Default

Respondent argues that this *Brady* claim is actually two separate claims: One concerning Mayeros, and one concerning Than. She further argues that the claims are procedurally defaulted.

Tong's claim concerning Mayeros was presented to the Texas state courts in a successive habeas corpus application filed on November 28, 2012. The TCCA dismissed the application as an abuse of the writ. *Ex Parte Tong*, 2013 WL 2285455 (Tex. Crim. App. May 22, 2013). Texas' abuse of the writ doctrine is an independent and adequate state bar to federal review. *See Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

The Texas abuse of the writ statute, article 11.071, § 5(a), provides, in relevant part, that the TCCA may not consider a subsequent habeas application unless a petitioner can show either that the claim could not have been timely raised in state court or that the claim raises a compelling federal claim:

(a)  If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1)  the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

> (2)  by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial . . . .

TEX. CODE CRIM. PROC. ANN. art. 11.071.  As written, the statute requires dismissal under § 5(a) unless one of the exceptions set out in §§ 5(a)(1), 5(a)(2), or 5(a)(3) has been met.  The TCCA, however, has held that to avoid dismissal under § 5(a), a petitioner must satisfy *both* the state procedural requirement of § 5(a)(1) *and* the federal merits requirements of § 5(a)(2) or 5(a)(3).  *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) ("We have interpreted [§ 5(a)] to mean that . . . 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.").

Petitioner argues that because the TCCA dismissed under § 5(a) without specifying whether dismissal was premised on a failure to satisfy state procedural law or the federal merits, this Court must presume that dismissal was premised on the merits.  In support, he cites *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007), in which the Fifth Circuit concluded

33

that no adequate and independent state procedural basis for dismissal could be discerned from the TCCA's "boilerplate" dismissal under § 5(a).  *Ruiz*, however, is distinguishable. There, it was plain that an assessment of the merits played a significant role in the dismissal. "[Bo]th the concurring and dissenting opinions, by their unanswered language, strongly suggest that the CCA debated and reached the federal merits question, not the independent state law ground." *Id.* at 528.  One TCCA panelist filed a concurring opinion concluding that Ruiz did not allege a meritorious Sixth Amendment claim. *Id.*.  Two other panelists filed a dissent from the dismissal, urging the merits of the Sixth Amendment claim. *Id.*.

In this case, however, the TCCA did not merely cite to § 5(a).  Rather, the TCCA specifically stated it was dismissing the application "as an abuse of the writ *without considering the merits of the claims.*"  *Ex Parte Tong*, 2013 WL 2285455 at *1 (emphasis added).  The TCCA thus made it clear that the dismissal was on state procedural grounds, and not on a determination that Tong failed to assert a constitutional violation.

Accordingly, the dismissal of Petitioner's subsequent habeas application was premised on an adequate and independent state procedural ground.  *Cf. Coleman*, 501 U.S. at 737, 739–40 ("In those cases in which it does not fairly appear that the state court rested its decision primarily on federal grounds, it is simply not true that the 'most reasonable explanation' is that the state judgment rested on federal grounds."  "In the absence of a clear indication that a state court rested its decision on federal law, a federal court's task will not be difficult.").

**Cause.–**  Tong argues that the failure to disclose the *Brady* evidence constitutes cause for his default.  He acknowledges that state habeas counsel discovered the evidence of a

Mayeros deal in or around 2004, but argues that this discovery came after his initial state habeas application was filed.  Am. Pet. at 79, 91.

There can be no doubt that suppression of evidence by the state can constitute cause for a procedural default if that suppression is the reason the petitioner failed to develop the claim in state court.  *Banks v. Dretke*, 540 U.S. 668, 692-94 (2004).  Respondent now argues that Tong was aware of Mayeros' criminal history at the time he filed his initial state application, and that Tong was also aware that the driving on a suspended license charge was dismissed before Tong's trial.  Respondent argues that, with reasonable diligence, Tong could have discovered the length of time between Mayeros' statement to police and the dismissal of his charges, and thus inferred the possibility of an undisclosed deal.  As noted above, before trial, Tong requested information about the criminal records of State's witnesses, and about any deals between the State and any witness.  The State did not disclose any information about Mayeros' criminal history or any deal with Mayeros.  Tong's trial counsel also testified that he reviewed the State's file on numerous occasions and never found any such information.  SH at 178-79.

In *Banks*, the Supreme Court rejected a similar argument.  The Court stated that its prior "decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Id.* at 695-96.  The Court concluded that a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."  *Id.* at 696.  Tong's evidence of suppression is thus sufficient to establish cause for his procedural default.

*Prejudice.*–  The question of prejudice is inextricably intertwined with the merits of Tong's underlying *Brady* claim.  Tong presents sufficient evidence to raise an inference that one or more deals were made between the state and Mayeros and/or Than, but the question of whether there was actually any such deal rests on incomplete and conflicting evidence. Therefore, an evidentiary hearing is required on Tong's *Brady* claim.

### b.    Evidentiary Hearing

Respondent argues that Tong is not entitled to an evidentiary hearing because he failed to develop this claim in state court.  AEDPA bars federal habeas courts from conducting evidentiary hearings when the petitioner failed to develop the factual basis of the claim in state court.  28 U.S.C. § 2254(e)(2).  The Supreme Court has stated, however, that a petitioner has not failed to develop the factual basis of a claim "unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

As discussed above, Tong's failure to fully develop this claim in state court appears to be the result of suppression of relevant evidence by the state.  As such, Tong's failure to fully develop this claim in state court did not result from a lack of diligence on Tong's part, and he is entitled to an evidentiary hearing on this claim.

### F.    Perjured Testimony

In a related claim, Tong argues that he was denied due process because the State sponsored perjured testimony when Mayeros testified that he did not have a deal.  The knowing use of perjured testimony by the state violates a defendant's right to due process of law.  *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S.

36

264 (1959); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000).  The Fifth Circuit has explained, however, that

> [t]o establish a due process violation based on the State's knowing use of false or misleading evidence, [a habeas petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false.  Evidence is false if, *inter alia,* it is specific misleading evidence important to the prosecution's case in chief.  False evidence is material only if there is any reasonable likelihood that [it] could have affected the jury's verdict.

*Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (internal citations and quotation marks omitted, third alteration in original).  "We do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .  A finding of materiality of the evidence is required under *Brady*."  *Giglio*, 405 U.S. at 154 (internal quotation marks and citation omitted).  When the question of materiality arises, "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.*

Respondent argues that this claim is time-barred because Tong raised it for the first time in his amended petition.  Under AEDPA, a State prisoner has one year in which to file a federal habeas corpus petition.  *Fierro v. Cockrell,* 294 F.3d 674, 679 (5th Cir. 2002).  The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his

37

state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of *certiorari* with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point, the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

Tong does not dispute that his conviction became final more than one year before he filed his amended petition. He contends, however, that this claim was raised in his original petition. The only support he offers for that contention is a citation to *Napue v. Illinois*, 360 U.S. 264 (1959), on page 40 of the original petition. While *Napue* does, indeed, hold that the State's failure to correct false testimony implicated a defendant's right to due process, Tong's original petition does not cite it for that point. Rather, the original petition cites *Napue* for the proposition that the ability to impeach a witness' truthfulness may influence the jury. The citation and accompanying quote were offered in support of Tong's *Brady* claim. Nothing in the original petition purports to raise a *Napue* claim. Accordingly, Tong's *Napue* claim is time-barred.

### G.   Use of a State Agent

Tong next contends that the State denied him his Sixth Amendment right to counsel by planting Mayeros in his holding cell to elicit incriminating information. In *Massiah v.*

38

*United States*, 377 U.S. 201 (1964), the Supreme Court held that the Sixth Amendment right to counsel bars "indirect and surreptitious investigations." *Id.* at 206.  In *United States v. Henry*, 447 U.S. 264, 273-75 (1980), the Court explicitly extended the *Massiah* principle to statements made to a cellmate who was a government plant.

The problem for Tong here is that he presents no evidence that Mayeros was planted in his cell by the State.  Rather, Tong's own time line establishes that Mayeros was in the cell as a result of his own legitimate arrest for driving on a suspended license.  Mayeros said nothing to police immediately after obtaining incriminating statements, but only said something a few days later to a police officer he knew personally.  That officer was not even a homicide officer, but was a client of Mayeros' house cleaning business.  That officer then put Mayeros in touch with someone from the homicide division.

In short, Tong points to no facts suggesting that the police planted Mayeros in Tong's cell, or that Mayeros was working on behalf of the State at the time Tong spoke to him.  It was only after the fact that Mayeros realized he had information that the police might find useful.  Because Mayeros was not acting as a government agent at the time Tong spoke to him, Tong fails to demonstrate any violation of his right to counsel that was caused by Mayeros.

### H.   Ineffective Assistance of Counsel During Guilt-Innocence

Tong raises numerous claims of ineffective assistance of trial and appellate counsel. To prevail on a claim for ineffective assistance of counsel, Petitioner "must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and "the deficient performance prejudiced the defense."

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, the "deficient performance" prong, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances, avoiding the distorting effects of hindsight.  Review of counsel's performance is deferential, and counsel enjoy a strong presumption that their conduct is within the bounds of professional norms.  *Id.* at 688-90.   To prove "prejudice" under the *Strickland* test, there must be a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  *Id.* at 687.

When a state court has adjudicated a claim of ineffective assistance of counsel on the merits, the petitioner bears an especially heavy burden.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689, 104 S.Ct. 2052; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*]*,* 556 U.S., at 123, 129 S.Ct. [1411], at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct., at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011).

### 1.    Cross-Examination of Adverse Witnesses

Tong contends that he received ineffective assistance of trial counsel because counsel failed to investigate and cross-examine Than about the fact that he was on probation, and was

40

the only identified co-conspirator in a bank larceny case who was not prosecuted.  Counsel submitted affidavits in connection with Tong's state habeas application.  They stated that they were aware of Than's impeachable offenses and had an investigator check Than's criminal history.  SH at 180, 188.  They stated that they chose not to impeach Than with his convictions of his probation status because the State elicited this information on direct examination.  They did not question him about his role in the bank larceny because there was no final conviction, and it was therefore not a proper basis for impeachment under Texas law, and it would have opened the door for evidence of Tong's participation in the larceny during the guilt-innocence phase of trial.  *Id.*

Tong also asserts that counsel was ineffective for failing to cross-examine Arthur Alvear.  Alvear testified that he did not hear any gunshots, and only looked toward the crime scene because his girlfriend, Sheila Huynh, pointed out that a person was running.  17 Tr. at 42.  Tong contends that Huynh was not called because she picked the wrong person out of a lineup, and argues that counsel should have cross-examined Alvear regarding Huynh's mistaken identification.

### a.    **Than**

The state habeas court credited counsel's affidavits and entered findings of fact reflecting counsel's explanations.  SH at 543-45.  The habeas court concluded that counsel did not render deficient performance in their cross examination of Than.

The trial record reflects that the State did, indeed, elicit Than's criminal history.   16 Tr. at 131.  Than also acknowledged that he was on probation for engaging in organized crime

and unlawfully carrying a weapon. *Id*. Thus, the information that Tong now contends counsel should have elicited was before the jury. This Court cannot say that the state court's conclusion that counsel did not render ineffective assistance in cross examining Than was an unreasonable one. Therefore, that conclusion is entitled to deference.

Even if, however, counsel's conduct did fall below prevailing professional standards, Tong fails to demonstrate prejudice. Tong characterizes Than's testimony as the only physical evidence linking him to the murder. In fact, Than testified that he sold jewelry that he received from Tong. That testimony was not the only evidence linking Tong to the murder. The jury also had Tong's confession and Alvear's identification. Even if counsel in some way further diminished the credibility of acknowledged felon and probationer Than, there is no reason to believe that such cross examination, in the face of a confession and an eyewitness identification, raises any reasonable likelihood of a different outcome. Therefore, Tong fails to demonstrate that the state habeas court's ultimate conclusion, *i.e.*, that Tong failed to state a Sixth Amendment claim of ineffective assistance of counsel based on the cross examination of Than, and Tong is not entitled to relief on this claim.

### b. <u>Alvear</u>

The state habeas court found that Alvear could not testify concerning his girlfriend's misidentification at the lineup because he was not present at that lineup. Therefore, any such testimony would be inadmissible hearsay. SH at 545. Tong argues that counsel should nonetheless have questioned Alvear on this subject because opposing counsel might not have

objected, and because the record of the lineup might have fit under a business or public records exception to the hearsay rule.

Tong points to no authority holding that counsel, to be effective, must pursue evidence that they know to be inadmissible.  Moreover, as respondent correctly points out, the Supreme Court has stated that counsel are not required to pursue a particular method of defending a defendant merely because they have nothing to lose by doing so.  *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).  Counsel were not ineffective for failing to pursue inadmissible testimony.  Tong also fails to explain how any records of the lineup could have come in through Alvear when Alvear was not present at the lineup attended by his girlfriend and had no personal knowledge of anything that happened at that lineup.  Thus, Tong fails to demonstrate ineffective assistance of counsel with regard to the cross examination of Alvear.

### 2.    Expert Witness

Tong next contends that counsel was ineffective for failing to retain a ballistics or firearms expert to testify about problems with Glock handguns, the weapon used to murder Trinh.  He argues that expert evidence that Glock 17s have a propensity to accidentally fire would have supported his own confession, in which he claimed that he shot Trinh accidentally.

Counsel stated that their strategy was to focus on the punishment phase of the trial. They also "did not want to present a bogus alibi defense or accidental shooting defense that might hurt our credibility with the jury when we asked for a life sentence."  Counsel further

stated that there was no reason to believe the shooting was accidental and they did not wish to invent evidence.  SH at 182.

The state habeas court found that Tong admitted to counsel that he intentionally committed the murder and counsel did not have a duty to fabricate evidence.  SH at 546. While Tong now includes an affidavit by a firearms expert, he did not present this evidence to the state habeas court.  Therefore, under *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), this Court may not consider this new evidence in determining if the state court adjudication was reasonable.

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983).   "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.*  Because Tong failed to provide any evidence in support of his argument in state court, the state habeas court's conclusion that counsel was not ineffective was not an unreasonable conclusion.

Moreover, it is beyond dispute that counsel has wide latitude in choosing trial strategy.

[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.  While Tong is correct that his confession stated that the shooting was accidental, he later chose to discredit his confession entirely by testifying at trial that he was at home with his girlfriend at the time of the murder.  Tong's current argument, then, is that counsel was ineffective for failing to present evidence supporting his confession and contradicting his alibi testimony.  It was not unreasonable for counsel to choose not to do so, and Tong has not shown that the state habeas court's resolution of this claim was itself unreasonable.  Therefore, Tong is not entitled to relief.

### 3.     Failure to Object to Jury Charge

Tong next contends that the jury charge was flawed because it did not require jury unanimity on whether Tong murdered Trinh while in the course of committing or attempting to commit robbery, or while Trinh was in the course of lawfully discharging his duties as a peace officer.  Tong cites *Ring v. Arizona*, 536 U.S. 584, 609 (2002), for the proposition that the Sixth Amendment requires that juries unanimously find any aggravating factor which operates as "the functional equivalent of an element of a greater offense."  He contends that the robbery/peace officer factors are such elements because, without a finding that one of the applies, Tong would not have been guilty of capital murder but, at most, simple murder.

A plurality of the Supreme Court stated in *Schad v. Arizona*, a capital case, that "[w]e have never suggested that in returning general verdicts . . . the jurors should be required to agree upon a single means of commission."  *Schad v. Arizona*, 501 U.S. 624, 631 (1991).  This portion of the *Schad* opinion was joined by four justices.  Justice Scalia concurred in the judgment, but did not join this portion of the opinion.  His concurring opinion, however,

makes clear that he agreed with the plurality's conclusion that the constitution permits a finding of guilt based on alternative theories, in that case whether Schad was guilty of first degree murder because he committed either premeditated murder or felony murder.

> As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission . . . That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict.

*Id.* at 649–50 (Scalia, J., concurring) (citations omitted).  Thus, a majority of the Court agreed that the Constitution permits the jury to be charged in the alternative, requiring unanimity only that all elements of the crime are proven beyond a reasonable doubt, but not on which of the alternative means of committing the crime was proven.  Because the jury charge complied with constitutional requirements, counsel's lack of objection did not constitute ineffective assistance.

### 4.    **Failure to Object to Closing Argument**

In closing argument, the prosecutor stated:

> Before you ever get to this lesser included offense of felony murder, everyone of you must have a reasonable doubt that it is capital murder . . . You never get to felony murder until everybody has at least a reasonable doubt that it is capital murder.

18 Tr. at 41.  Tong contends that counsel rendered deficient performance by failing to object to the prosecutor's statements in closing argument informing the jury that they must unanimously agree that there was a reasonable doubt that Tong was guilty of capital murder before considering lesser included offenses, and that they must convict Tong of capital murder if they did not believe his alibi defense.

### a.    Unanimity

While Tong is correct that the prosecutor's comment regarding unanimity of reasonable doubt was an incorrect statement of the law, the jury charge on this issue correctly informed the jury that they were to consider felony murder if they did *not* unanimously find Tong guilty beyond a reasonable doubt of capital murder.   CR at 124, 132.[6]   Jurors are presumed to follow the court's instructions, *see Galvan v. Cockrell*, 293 F.3d 760, 765-66 (5th Cir. 2002), and Tong makes no showing that his jury failed to do so here.   Therefore, assuming counsel were ineffective for failing to object, Tong nonetheless fails to demonstrate any prejudice.

### b.    Alibi

In his closing argument, the prosecutor stated:

> You don't have to worry about whether [the shooting]'s accidental, intentional or anything else, if you believe the defendant that he wasn't there, he was asleep at the time this crime was committed.  So, it's an all or nothing situation.  It's capital murder or it's nothing.  He is not guilty of anything.  He is the wrong guy.  We got the wrong guy here.

18 Tr. at 42

Under Texas law, a prosecutor may present argument to the jury on four types of issues:  (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and (4) pleas for law enforcement.  *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App.1992).   The state habeas court found that the prosecutor's argument was "summation of the court's charge and evidence presented, that

---

[6]        "CR" refers to the Clerk's Record.

intent or accident was not an issue for the jury to consider because [Tong] testified that he was not present at . . . the shooting." SH at 548. The state court's conclusion is not unreasonable.

Tong testified that he was asleep with his girlfriend at the time of the shooting. He therefore removed any question of accident or intent from the case. Moreover, the state habeas court's conclusion that the argument complied with Texas law is binding on this Court. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Because the prosecutor's statement was not objectionable as a matter of Texas law, counsel did not render deficient performance by not objecting.

### 5.   Failure to Argue Specific Intent

Tong next argues that counsel were ineffective because they did not argue that the State failed to prove beyond a reasonable doubt that Tong intentionally killed Trinh. This claim is procedurally defaulted and without merit.

### a.   Procedural Default

Respondent points out that Tong never presented this claim to the Texas state courts. Tong responds that he raised seven separate claims of ineffective assistance of counsel on direct appeal. While this is correct, none of those seven claims argues that counsel was ineffective for failing to argue that the State failed to prove beyond a reasonable doubt that he intentionally killed Trinh. *See* Tong's Brief on Appeal.

Tong also argues that the State, in its state habeas response, referenced affidavits by trial counsel in which they stated that they intended to argue the specific intent issue. Setting aside any questions of the specific context in which the State's references appeared, an applicant may not rely on the State's response to raise issues on behalf of the applicant, *i.e.*, Tong. Tong's own state habeas application did not raise this issue, and he thus failed to present this issue to the state courts. Tong makes no argument that the default is excused by cause and prejudice. Therefore, this claim is procedurally defaulted, and this Court cannot grant relief.

### b.    <u>Ineffective Assistance</u>

Procedural default notwithstanding, Tong fails to demonstrate ineffective assistance of counsel.

*Deficient Performance*.– Counsel stated that he felt constrained in his ability to argue specific intent because Tong testified that he was not at the crime scene. Tong now argues that counsel could, and should, have made alternative arguments.

While Tong is correct that attorneys frequently argue alternative theories, the alternatives Tong urges in this case detrimentally contradict each other. Tong, in essence, argues that counsel should have said: "If you believe that my client lied to you about his alibi that he was asleep with his girlfriend when the murder took place, then you should find that the State failed to prove specific intent." It was not an unreasonable strategic decision for counsel to choose not to highlight the possibility that Tong perjured himself. Therefore,

counsel's decision not to more strenuously argue specific intent was not deficient performance.

*Prejudice.*– The evidence presented at trial showed that Trinh was shot in the head at close range, and that Tong was not remorseful about the shooting. In light of this evidence, there is no reasonable likelihood that counsel's alternative argument concerning specific intent would have resulted in a different outcome. Tong therefore fails to demonstrate *Strickland* prejudice.

### 6.      Absence of Objection that Subpoenaed Witnesses Failed to Appear

Tong states that trial counsel's notes include a "subpoena list" which includes names of several potential witnesses who did not testify at trial. He contends that this shows that counsel either failed to subpoena these witnesses, or failed to object when they did not appear after being subpoenaed.

Trial counsel stated that they discussed possible witnesses with Tong. SH at 179, 187. They listed the names provided by Tong, and either spoke to the witness and decided that he or she would not be helpful, or could not locate the person. *Id.* at 179, 182-83, 187, 191. Tong makes no showing that counsel's decisions not to call those witnesses they located were unreasonable because he makes no showing that those witnesses would have been helpful to his case. He also fails to demonstrate that counsel's inability to locate other witnesses was the result of deficient performance. He therefore fails to demonstrate ineffective assistance of counsel with regard to the subpoena list.

50

7.    **Forensic Evidence**

In his confession, Tong said that he jumped over the store counter and held the gun on Trinh.  When jumping back over the counter, he claims that he accidentally shot the victim. The police found two cold drinks on the counter.  Tong contends that the State used the presence of these drinks to argue that Tong could not have jumped over the counter, and thus to counter his accidental shooting theory.  He now contends that the drinks may have been placed on the counter after the shooting, and that counsel were ineffective because they did not call a forensic expert "to investigate the chronology of events."

Tong mischaracterizes the prosecutor's argument.  The prosecutor did not argue that the presence of the drinks showed that Tong did not jump over the counter.  Rather, the prosecutor stated:

> If he had jumped over that counter[,] as he claimed he had done in this and later in the oral statement[,] there would have been items that were for sale that would have been disturbed on the counter top. Look at the photographs[,] play that video back there and you will see that the counter area is pristine. They had many many items for sale there in the store. Not anything[,] not a single thing[,] has been knocked over nothing has been knocked on to the floor nothing is on the floor except Officer Trinh. He did not jump over that counter he walked around the end of the counter and confronted him.

18 Tr. at 65-66.  The prosecutor does not mention the drinks; he talks about the many items that were for sale on the counter.  Tong makes no showing that a forensics expert would have been helpful in this regard.  He thus fails to demonstrate either deficient performance of prejudice.

## I.      Ineffective Assistance of Counsel in the Punishment Phase

Tong raises four separate claims of ineffective assistance of counsel during the punishment phase of his trial.

### 1.      Statements About Parole

Tong criticizes the prosecutor's following statement, concerning Christina Lee, in closing argument:

> [Tong's] crimes don't end on April 4th or that day or today, they live forever. They live forever.  He has given the Lees a life sentence, he has given that girl a life sentence, for however long her life shall be.  After forty years she won't be paroled of that life sentence that she will get.  She's still going to have to live with the memory of what happened, the events of what happened, and they will live with what happened for the rest of their life.

20 Tr. at 153.  Tong argues that this was an improper reference to his being eligible for parole after 40 years.  He argues that this was improper because the jury was instructed not to consider the possibility of parole, and that this argument bolstered the State's argument that Tong would pose a future danger to society.  He contends that counsel's failure to object to this statement constituted ineffective assistance of counsel.

The state habeas court found that the argument was proper, did not invite the jury to consider parole, and was a proper summation and inference from the evidence.  SH at 549-50. State court conclusions on matters of state law are entitled to great deference.  *Charles v. Thaler*, 629 F.3d 494, 504 (5th Cir. 2011).  Despite Tong's protestations to the contrary, the state court's conclusion is not unreasonable.

The prosecutor was discussing evidence of an extraneous offense in which Tong shot a toddler.  His argument points out that she would carry the physical and emotional scars from

52

that event for the rest of her life.  Moreover, the trial court instructed the jury that, while Tong would be eligible for parole after forty years if sentenced to life imprisonment, there was no guarantee that he would ever be paroled.  The trial court instructed the jury not to consider the possibility of parole in deliberating Tong's sentence. The state court's conclusion that the argument was proper under Texas law is therefore not unreasonable.  Thus, counsel was not ineffective for failing to object.

### 2.    Mitigation Argument

The prosecutor told the jury that "[w]e're not to come up with a specific answer to one of the [special issues] because we sympathize with the defendant," and "the test on that is whether or not [the evidence] reduces [Tong's] moral blameworthiness."  20 Tr. at 110-11. Tong contends that the prosecutor incorrectly told the jury that they could not allow their punishment phase verdict to be swayed by sympathy for Tong.  He acknowledges that the Texas courts have held that jurors can give consideration to all mitigating evidence, and that mitigating evidence can be anything that jurors believe might reduce a defendant's moral blameworthiness. He argues that the prosecutor improperly narrowed the jury's consideration of mitigating evidence by stating that there was no "causal connection" between the evidence and the murder.  He further contends that his attorneys were ineffective for failing to object to the prosecutor's alleged attempts to narrow the scope of the jury's consideration of mitigating evidence to that which reduces Tong's moral blameworthiness.

In *Lockett v. Ohio*, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . .

as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original). This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases." *Id.* at 605. In *Penry v. Johnson*, 532 U.S. 782 (2001), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence." *Id.* at 797 (internal quotation marks, citation and brackets omitted).

The trial court in this case instructed the jury that they were not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling . . . ." CR at 141. The trial court further defined "mitigating evidence" as

> evidence that a juror might regard as reducing the defendant's moral blameworthiness, including, but not limited to, evidence of the defendant's background and character, or the circumstances of the offense that mitigates against the imposition of the death penalty.

*Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Thus, the trial court did not instruct the jury that sympathy could play no part in its determination, but that they were not to be swayed by "mere . . . sympathy . . . ."

The TCCA has explained that jurors may not base a decision on "mere sympathy or emotional response . . . ." *Prystash v. State*, 3 S.W.3d 522, 534-35 (Tex. Crim. App. 1999). The jury is free, however, to consider all of the defendant's evidence, including evidence of a difficult childhood, history of abuse, etc., in weighing the defendant's moral blameworthiness. *Tong*, 25 S.W.3d at 713. The TCCA further noted that "[t]he argument about which appellant complains was merely a reiteration of the law on which the jury was charged and was, therefore, proper argument." *Id.*

54

The Supreme Court has upheld an identical anti-sympathy instruction, and rejected a nearly identical argument that the instruction was unconstitutional:

> The jury was told not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Respondent does not contend, and the Supreme Court of California did not hold, that conjecture, passion, prejudice, public opinion, or public feeling should properly play any role in the jury's sentencing determination, even if such factors might weigh in the defendant's favor. Rather, respondent reads the instruction as if it solely cautioned the jury not to be swayed by "sympathy." Even if we were to agree that a rational juror could parse the instruction in such a hypertechnical manner, we would disagree with both respondent's interpretation of the instruction and his conclusion that the instruction is unconstitutional.

*California v. Brown*, 479 U.S. 538, 542 (1987).

Because neither the prosecutor's argument nor the jury charge precluded the jury's consideration of any of Tong's evidence in determining his moral blameworthiness, the argument and instruction met constitutional standards. As the TCCA observed, the argument and instruction complied with Texas law. This ruling was not an unreasonable construction of Supreme Court authority. Counsel was not ineffective for failing to raise a meritless objection.

Even if the prosecutor's comment was improper, however, Tong fails to demonstrate prejudice. As discussed above, the jury was properly charged that mitigating evidence included "evidence that a juror might regard as reducing the defendant's moral blameworthiness, including, but not limited to, evidence of the defendant's background and character . . . ." Jurors are presumed to follow the court's instructions, *see Galvan v. Cockrell*, 293 F.3d 760, 765-66 (5th Cir. 2002), and Tong makes no showing that his jury failed to follow its instructions. Therefore, any error in the prosecutor's statement was cured by the

trial court's instruction, and Tong fails to demonstrate *Strickland* prejudice, or that the TCCA's resolution of this claim was unreasonable.

### 3.    Victim Impact Testimony

Tong argues that counsel were ineffective by failing to object, during the punishment phase of his trial, to victim impact testimony from the Lee family, victims of an extraneous offense committed by Tong. He complains that Mr. and Mrs. Lee, and Trinh's father, all testified concerning their opinions of Tong, and their opinions that he should receive the death penalty.

Counsel did, in fact, object to Mrs. Lee's statement asking for the death penalty. His objection was that the statement was nonresponsive, whereas Tong argues that he should have objected to the statement as irrelevant and inadmissible. The objection was overruled.

*The Lees' Testimony*.– Mr. and Mrs. Lee both testified that their daughter was still frightened by the shooting. Mrs. Lee, in response to a question about how the shooting affected her life, testified:

> Word in dictionary to describe how painful for a parent to see your child like that. It is a nightmare, it's worse than death itself. Sometime I wish they were all dead. I have to say I hope he receive death sentence. Still a lot more lenient, a lot more merciful than death sentence he gave to my family. It's death of a soul and death of spirit.

19 Tr. at 250. At that point, counsel objected to the statement as nonresponsive. The objection was overruled. *Id.*

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not bar the admission of victim impact testimony by those affected by the crime for which the defendant has been tried. The Court reasoned that "the consideration of

56

the harm caused by the crime [is] an important factor in the exercise of [sentencing] discretion." *Id.* at 820. Victim impact testimony is a mechanism by which the sentencer is informed of the degree of harm caused by the crime. *Id.* at 824-25. The TCCA, however, has held that evidence of the impact on victims of extraneous offenses "is not relevant as [Tong] was not on trial for [the extraneous offense] and such evidence serves no purpose other than to inflame the jury." *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).

On Tong's direct appeal, the TCCA did not rule that the Lees' testimony was inadmissible, but stated that it was at least arguably objectionable. *Tong v. State*, 25 S.W.3d at 713 n.9. The Court noted, however, that the record before it was silent as to counsel's reason for not objecting, and it therefore found that Tong failed to demonstrate ineffective assistance of counsel at that time. *Id.* at 714 . The TCCA also stated that ineffective assistance of counsel claims are usually raised in a habeas corpus proceeding, not on appeal, because habeas provides a greater opportunity to develop an evidentiary record. *Id.* at 714 n.10. The Court invited Tong to raise the claim on habeas corpus review where he would have an opportunity to present evidence in support of his claim. *Id.* Tong, however, did not do so. This Court is thus restricted to the record on Tong's direct appeal.

Respondent, citing *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002), now argues that the Lees' testimony was not victim impact evidence because it addressed the effect of the crime on them, the victims, not on others. *Mathis* defines "victim impact evidence" as "evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Id.* Respondent also cites *Roberts v. State*, 220 S.W. 3d 521, 531 (Tex. Crim. App. 2007), where an extraneous offense victim testified that she had to quit her

job, was afraid of people, and had trouble sleeping, for the proposition that the Lees' testimony was admissible under Texas law. *Roberts* specifically distinguishes the testimony in that case from that in *Cantu* on the grounds that the extraneous offense victim in *Roberts* testified about the impact on herself, not on others. *See also Roberts v. Thaler*, 681 F.3d 597, 611-12 (5th Cir. 2012).  Therefore, Respondent argues, the Lees' testimony was admissible, and any objection would have been frivolous.

Respondent further argues that, even if counsel should have objected, Tong was not prejudiced.  Respondent notes that the punishment phase took two days and comprised approximately 250 pages of transcript, whereas the challenged evidence "spanned a couple of paragraphs over four pages."  Summary Judgment Motion at 126.  In light of the other substantial punishment phase evidence, Respondent contends that there is no reasonable probability that the result would have been different had counsel objected.[7]

The TCCA found, on Tong's direct appeal, that the record was insufficient to determine whether counsel rendered deficient performance by failing to object to this testimony.  This Court must evaluate the reasonableness of the TCCA's conclusion based on the same record.  *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).  Based on that record, this Court cannot conclude, under the "doubly deferential" standard of review required by

---

[7]     Respondent now speculates that counsel may have chosen to object on the basis of nonresponsiveness because he wanted to object to the statement without highlighting the substance of the statement to the jury.  This explanation seems unlikely as an objection on relevance grounds would not have done any more to highlight the statement than an objection as nonresponsive.  Respondent further unconvincingly speculates that counsel may have decided to make a low key objection to the statement because one would expect Mrs. Lee to want the death penalty for Tong after he shot her husband and daughter.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011), that the state court's conclusion that Tong failed to adequately demonstrate deficient performance was unreasonable. Therefore, this Court must defer to the state appellate court.

***Trinh's Testimony***.– Mr. Trinh, asked how Tony's death affected his other son, stated: "And, until today, we lived the day he have to pay the right price for what he did." 20 Tr. at 15. Tong does not argue that Mr. Trinh's testimony was improper victim impact testimony. Rather, he argues that Trinh also improperly asked the jury to sentence Tong to death, and that counsel failed to object.

Tong mischaracterizes Mr. Trinh's testimony. Trinh stated that his family wanted Tong "to pay the right price" for his crime. This statement does not ask the jury to sentence Tong to death, but to impose a just sentence. Other than his mischaracterization of Trinh's statement as a request for a death sentence, Tong points to no basis for objection. Counsel was not ineffective for failing to object to an unobjectionable statement.

### 4. Failure to Investigate and Present Mitigating Evidence

Tong next argues that counsel failed to investigate and present mitigating evidence. He cites specific evidence concerning Tong's difficult circumstances after his arrival in Houston when he was about seven years old. He suffered physical and sexual abuse. Respondent argues that this claim is procedurally defaulted and without merit.

### a. Procedural Default

Respondent notes that Tong did not raise this claim in his initial state habeas application. He raised it for the first time in his federal petition. This Court stayed this case to allow Tong to return to state court to present this and other unexhausted claims.

59

In his second state application, Tong raised a claim of ineffective assistance of counsel based on counsel's failure to investigate and present mitigating evidence. The state habeas court dismissed the application as an abuse of the writ without reaching the merits of the claim.

Respondent further argues that the claim now presented to this Court is not the same claim Tong presented in his second state habeas application. Respondent argues that Tong never advised the state court which witnesses he believed should have been called or what their testimony would have been. In this Court, Tong cures this deficiency and names specific individuals whom he contends should have been called, and describes the testimony they could have given.

Tong argues that the failure to present this evidence in state court was the result of ineffective assistance of state habeas counsel. That ineffective assistance, in turn, provides cause for any procedural default. As discussed below, however, Tong fails to demonstrate that trial counsel rendered deficient performance in their investigation and presentation of the mitigation case. Therefore, even if state habeas counsel rendered deficient performance, Tong cannot demonstrate prejudice.

### b.      Time Bar

Respondent also argues that this claim is time-barred. Respondent acknowledges that Tong's original federal habeas petition was timely, and raised a claim of ineffective assistance of counsel based on a failure to investigate and present mitigating evidence. Respondent argues, however, that Tong's original claim was not supported by evidence. Respondent points to no case holding that a litigant must present evidence, as opposed to merely pleading

the claim, within the limitations period to avoid a time bar.  As Respondent concedes, the claim was raised in a timely manner.  There is therefore no time bar.

### c.      Ineffective Assistance of Trial Counsel

Tong argues that counsel failed to identify and interview numerous family members who could have presented evidence of Tong's dysfunctional family situation after his arrival in Houston, including his alienation from others caused by his inability to speak English or Vietnamese, the fact that he was, at times, subjected to harsh physical punishments, and allegations that he was sexually abused.

The record shows that trial counsel employed two investigators who logged over one hundred hours of investigation.  Second Am. Pet. Exh. 19 at 4-6, 19-20.  Counsel also interviewed Tong on numerous occasions at the Harris County Jail, members of his family, and people who knew him as a child, including teachers and childhood acquaintances.  SH at 179, 187.  Counsel concluded that many of these people would not have been helpful to the defense, and at least one family member refused to testify on Tong's behalf.  *Id.*

Counsel spoke to Nikki Tang, Tong's girlfriend at the time of the Trinh murder.  She told counsel that she wanted nothing to do with the case, that she was not going to help Tong, and that she would not corroborate his alibi.  *Id.* at 179.

Counsel subpoenaed at least two of Tong's relatives, Michelle Tong and Quin Tran.  One or both of them told counsel that they wanted nothing to do with Tong or his trial.  *Id.* at 183, 191.  Counsel concluded that they would not be helpful witnesses.  *Id.*  Tong's father testified.

Counsel also retained a psychologist to evaluate Tong, an expert "on the Vietnamese immigrant experience in the United States," and another expert to evaluate Tong's educational records. *Id.* at 179, 181.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S.510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 668 U.S. at 690-91).   When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.  To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

While Tong now contends that counsel's investigation did not comply with the relevant American Bar Association Guidelines, those guidelines are not controlling in this circuit.

> The ABA Guidelines do not control our assessment. The Supreme Court has explained that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009) (quotation marks and citation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (quoting *Strickland*, 466 U.S. at 690). We look for guidance about the norms in the relevant state as they existed at the time of the trial. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) . . . The Guidelines are helpful only if they "reflect prevailing norms of practice." *Van Hook*, 130 S. Ct. at 17 n.1 (quotation marks and citation omitted).  The Guidelines also "must not be so detailed that they would interfere with the constitutionally protected independence of counsel and

62

restrict the wide latitude counsel must have in making tactical decisions." *Id.* (quotation marks and citation omitted). Whether a counsel's decisions are legitimate will depend on the circumstances. *Id.* at 16.

*Ayestas v. Thaler*, 462 Fed. App'x 474, 479,  (5th Cir. 2012), *vacated on other grounds,* 133 S.Ct. 2764 (2013).

Other than the evidence that he was sexually abused, much of the evidence Tong now cites is largely duplicative of, or merely provides some additional detail to, evidence that was before the jury.  Moreover, as Respondent points out, counsel developed a biographical history with input from Tong.  Tong made no mention of any sexual abuse in his youth.  This omission provides some reason why counsel did not go digging for such evidence.

In sum, Tong fails to demonstrate that his counsel were deficient.  They retained professional investigators, conducted interviews with Tong and members of his family, and retained appropriate experts to assist in the preparation of Tong's mitigation case.  Tong is not entitled to relief on this claim.

### J.     Ineffective Assistance of Appellate Counsel

Tong next raises several claims of ineffective assistance of counsel on his direct appeal. A defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under state law.  *Evitts v. Lucy*, 469 U.S. 387, 395 (1985).  The *Strickland* two-prong standard applies to claims of ineffective assistance of appellate counsel. *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992).

Appellate counsel is not required to raise every possible non-frivolous claim on appeal. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or

at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).  However, "a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. . . . Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999).

### 1.  Voir Dire

Tong first argues that counsel was ineffective by inadequately briefing the jury voir dire issue discussed above.  While the trial court's actions in changing the voir dire process midstream is quite troubling, Tong fails to identify any due process violation, as discussed in detail above.  Because the underlying claim does not state a constitutional violation, it did not constitute deficient performance for counsel to fail to fully brief this issue, nor can Tong demonstrate any *Strickland* prejudice.  For the same reasons, the state habeas court's conclusion that counsel was not ineffective for failing to adequately brief this issue was not unreasonable.  This claim is without merit.

### 2.  Confession Issues

Tong next argues that appellate counsel was ineffective by failing to raise issues relating to his confessions.  As discussed above, however, these claims lack merit.  Counsel was not ineffective for failing to raise meritless claims.

### 3.  Identification Issues

In his final claim of ineffective assistance of appellate counsel, Tong argues that counsel was ineffective for failing to raise any issues relating to Alvear's identification of Tong.  As discussed above, however, Tong fails to show that the lineup was improperly

suggestive, or that his rights were violated in any way by the identification procedure or the admission of Alvear's identification.  Because the underlying claim is without merit, counsel was not ineffective for failing to raise this claim.

### K.    The 12-10 Rule

Petitioner argues that article 37.071 of the Texas Code of Criminal Procedure, which requires a jury instruction informing the jury that it must have at least 10 "no" votes to answer "no" on the aggravating special issue,[8] and at least 10 "yes" votes to answer the mitigation special issue[9] "yes," violates the Eighth Amendment.[10]  In fact, the failure to unanimously agree on either answer would result in a life sentence.  Petitioner argues, therefore, that this misleads the individual jurors into thinking that they cannot return a life sentence unless at least ten jurors agree on an answer to the special issue. Petitioner also argues that the trial

---

[8]      The aggravating special issue in this case asked:  "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Chuong Duong Tong, would commit criminal acts of violence that would constitute a continuing threat to society?"  CR at 134.

[9]      The mitigation special issue in this case asked:  "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Chuong Duong Tong, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"  CR at 135.

[10]      The jury was instructed:  "You may not answer Special Issue No. 1 [the future dangerousness issue] "YES" unless you agree unanimously.  You may not answer Special Issue No. 1 "NO" unless ten (10) or more jurors agree.  Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1 . . . You are instructed that if you return an affirmative finding, that is, a "YES" answer, to Special Issue No. 1, and only then, are you to answer Special Issue No. 2 [the mitigation special issue].  You are instructed that in answering Special Issue No. 2, you shall answer the issue "YES" or "NO."  You may not answer Special Issue No. 2 "NO" unless you agree unanimously, and you may not answer Special Issue No. 2 "YES" unless ten (10) or more of you agree to do so.  You need not agree on what particular evidence supports an affirmative finding on Special Issue No. 2."  CR at 140.

court erred in refusing his request to instruct the jury that the failure of the jury to unanimously agree on an affirmative answer to an aggravating special issue or on a negative answer to the mitigation special issue would result in a life sentence. The Fifth Circuit has rejected similar challenges to Texas' 12-10 rule. *See*, *e.g.*, *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000).

Moreover, this claim is barred by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). In *Teague*, the Supreme Court held that, except in very limited circumstances, a federal habeas court cannot retroactively apply a new rule of criminal procedure. The Court explained that

> a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 301 (emphasis in original). The AEDPA effectively codified the *Teague* non-retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly established at the time the conviction becomes final." *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002) (citing *Terry Williams v. Taylor*, 529 U.S. 362, 380-81 (2000)). Tong points to no case holding that Texas' 12-10 rule is unconstitutional. Because the result Tong now seeks was not dictated by controlling precedent at the time his conviction became final, this Court cannot grant relief on this claim.

### L.   Burden of Proof on Mitigation Special Issue

Tong, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), argues that his Sixth, Eighth, and Fourteenth Amendment rights were violated

66

because the Texas capital sentencing scheme does not require the State to prove beyond a reasonable doubt that the mitigating evidence was not sufficient to justify a life sentence. *Apprendi* itself rejects Tong's position.

> Finally, the principal dissent ignores the distinction the Court has often recognized, *see, e.g.*, *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), between facts in aggravation of punishment and facts in mitigation. . . . If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

*Apprendi*, 530 U.S. at 491 n.16.  The Supreme Court has thus drawn a critical distinction between aggravating and mitigating circumstances in sentencing proceedings.  To the extent that some aggravating circumstance is required before the court may exceed an otherwise-prescribed sentencing range, the State must prove those aggravating circumstances beyond a reasonable doubt.  Under the Texas capital sentencing statute, the statutory maximum sentence in the absence of proof of aggravating circumstances is life imprisonment.  A court cannot sentence a defendant to death unless the State proves beyond a reasonable doubt that there is a probability that the defendant will commit future acts of violence constituting a continuing threat to society, and that he acted with the requisite mental state.  Once the State has proven these two factors, the defendant may be sentenced to death. The sentencing scheme, however, gives a defendant another opportunity to show that death should not be imposed, even though the State has met its burden of proof.  The mitigation special issue is, in this sense, analogous

67

to an affirmative defense. *Apprendi* does not prohibit placing the burden of proof on this special issue on the defendant. The mitigation special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a sentence *less than* the statutory maximum. As the Fifth Circuit has expressly stated, "no Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). This claim is also *Teague*-barred. Tong's claim regarding the burden of proof on the mitigation special issue does not merit relief.

### M.   Denial of Consular Assistance

Tong, a Vietnamese national, next argues that he was denied his rights under the Vienna Convention on Consular Relations, when he was not provided access to assistance from the Vietnamese consulate. Respondent argues that this claim is procedurally defaulted and without merit.

### 1.   Procedural Default

Tong acknowledges that he did not present this claim to the Texas state courts until his successive habeas application. The state habeas court found that Tong waived his right to review of this issue, but also addressed the factual and legal bases of the claim. Tong argues that it is therefore not clear that the habeas court relied on an independent and adequate procedural basis for denying the claim. As discussed above, however, addressing the merits of a claim in the alternative does not render the state court's finding that the claim is procedurally barred as a matter of state law inadequate to bar federal review. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

68

There is no question that the state habeas court found this claim barred under Texas law. It is therefore procedurally defaulted. Tong makes no showing of cause and prejudice. Therefore, this Court cannot grant relief on this claim.

### 2.    Vienna Convention

The Vienna Convention is a 79-article, multilateral treaty negotiated in 1963 and ratified by the United States in 1969. Vietnam is a signatory nation. Per Article 36, "the treaty requires an arresting government to notify a foreign national of his right to contact his consul." *United States v. Jimenez-Nava*, 243 F.3d 192, 195 n.2 (5th Cir. 2001). There is no dispute that Petitioner was not notified of his right to contact the Vietnamese consulate.

Since 2001, however, Fifth Circuit case law has barred Tong's Vienna Convention claim. Tong necessarily argues that Article 36 creates an individually enforceable right. The International Court of Justice ("ICJ") held in the *LaGrand Case (Germany v. United States of America)*, 2001 ICJ 104 (Judgment of June 27) ("*LaGrand*")) that Article 36 creates personal rights. *LaGrand* at ¶ 77. The International Court of Justice adhered to this position in *Avena and Other Mexican Nationals (Mexico v. United States of America)*, 2004 ICJ 128 (Judgment of March 31) ("*Avena*"). *See Avena* at ¶ 4. The Fifth Circuit, however, has rejected this view and held that Article 36 of the Vienna Convention does not create an individually enforceable right. *Jimenez-Nava*, 243 F.3d at 198 ("The sum of [petitioner's] arguments fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation between a detained foreign national and his consular office. Thus, the presumption against such rights ought to be conclusive.").

Tong's basic argument is straightforward:  The Vienna Convention requires law enforcement officials to inform an arrested foreign national that he has the right to contact his consulate, police failed to so notify Tong, and Tong was prejudiced by the lack of consular assistance.  Tong also notes a memorandum by then-President George W. Bush directing state courts to address the claims of foreign nationals raising Vienna Convention claims, as well as decisions by the ICJ.  Respondent does not dispute that police were required by the Vienna Convention to inform Tong of his right to consular assistance, or that they failed to do so.

In 2008, the Supreme Court issued its decision in *Medellin v. Texas*, 552 U.S. 491 (2008).  Medellin raised essentially the same argument now raised by Tong, *i.e.,* that his Vienna Convention rights were violated and that international law requires that Unites States courts give him an opportunity to vindicate those rights.  The Supreme Court disagreed.

In addressing Medellin's claims, the Supreme Court held that, while the *Avena* decision constitutes an international law obligation on the part of the United States, it does not "constitute binding federal law enforceable in United States courts."  *Id.* at 504.  This is so because the Vienna Convention is not a self-executing treaty; that is, it does not by itself impose domestic law obligations in the absence of implementing legislation.  *Id.* at 505-06.  The Court further held that,  while the United States agreed under the treaty to submit disputes to the ICJ, the United States did not agree to be bound by the ICJ's decisions, likening the ICJ proceedings to nonbinding arbitration.  Treaty obligations require only that signatory nations take future action through the political process to comply with an ICJ decision.  *Id.* at 507-12.

The Supreme Court further found that, notwithstanding the fact that Medellin was specifically named in the *Avena* action, he was not a party to the case.   Only nation-states can

70

be parties to ICJ cases, and ICJ judgments are binding only between those parties.  *Id.* at 512.
In sum, "[t]he pertinent international agreements . . . do not provide for implementation of ICJ
judgments through direct enforcement in domestic courts . . . ."  *Id.* at 513.

The Court also rejected Medellin's argument that the President's memorandum rendered
the ICJ judgment enforceable.  "The President has an array of political and diplomatic means
available to enforce international obligations, but unilaterally converting a non-self-executing
treaty into a self-executing one is not among them."  *Id.* at 525.  The Court has since reaffirmed
*Medellin*.  *See Garcia v. Texas*, 564 U.S. 940 (2011).

The crux of *Medellin* is to reaffirm the longstanding Fifth Circuit position that the
Vienna Convention creates no individually enforceable rights.  *See*, *e.g.*, *Jimenez-Nava*, 243
F.3d at 198.  Because this Court is bound by Supreme Court and Fifth Circuit precedent, the
Vienna Convention supplies no basis on which to grant habeas corpus relief.

## N.      Restraint at Trial

Tong next contends that he was denied due process when the trial court allowed him to
be restrained during his trial.  Nothing in the trial record demonstrates that Tong was
restrained, but the affidavits of his trial attorneys confirm that he wore a brace on one leg that
would lock if Tong tried to run.  They state, however, that the brace was "completely
concealed" by Tong's pants.  SH at 183, 192.   The judge ordered Tong to wear the brace due
to concerns that Tong might try to hurt someone.  *Id.*

"We begin with the threshold premise than an accused is presumed innocent and, as
such, is entitled to all of the trappings of innocence during trial."  *United States v. Nicholson*,
846 F.2d 277, 279 (5th Cir. 1988) (citations omitted).  Thus, the shackling of a defendant

during trial, a practice that potentially threatens the defendant's presumption of innocence,

bears close scrutiny. *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 1345 (1986) (citing

*Estelle v. Williams*, 425 U.S. 501, 503-04, 96 S. Ct. 1691, 1692-93 (1976)); *Marquez v.*

*Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994) ("Restraint at trial may carry a message that a

defendant continues to be dangerous.")

These important due process concerns "must be balanced against the court's obligation

to protect the court and its processes, and to attend to the safety and security of those in the

courtroom." *Nicholson*, 846 F.2d at 279 (citations omitted); *Marquez*, 11 F.3d at 1244.

"While a defendant is entitled to the physical indicia of innocence, a court is justified in

ordering him handcuffed and shackled during trial [when] there is a danger of escape or injury

to the jury, counsel, or other trial participants." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir.

1994); *Chavez v. Cockrell*, 310 F.3d 805, 809 (5th Cir. 2002) (use of stun-belt was not abuse

of discretion where defendant was a flight risk); *Marquez*, 11 F.3d at 1244 (court has discretion

in determining whether restraints are needed to ensure safety of trial participants or sanctity

of trial).  Also, the trial court's mitigation of any potential prejudicial effect on the jury

amplifies the reasonableness of the decision. *See Chavez*, 310 F.3d at 8.  Most importantly,

this inquiry "does not trigger a type of 'least means' analysis.  That in retrospect some lesser

restraint might have sufficed is not determinative." *Marquez*, 11 F.3d at 1244.

The only available evidence on this matter shows that Tong's restraint was hidden from

the jury.  The brace was hidden by his pants, and the lower half of his body was hidden from

the jury by a table.  SH at 183, 192.  Tong took the witness stand, and returned to the counsel

table after testifying, out of the presence of the jury. *Id.*  The jury did not see Tong enter or

leave the courtroom. *Id.* The prosecutor also stated that he could not see the brace and that the jury never saw it. *Id.* at 169.

The state habeas court found the affidavits credible, found that Tong posed a risk of harm to others or of escape, and found that the jury never saw the brace. SH at 561. Tong presents nothing to call these findings into question. Therefore, the state habeas court's findings and conclusion are reasonable and are entitled to deference under the AEDPA. Tong is not entitled to relief on this claim.

### O.      Independent Investigation by a Juror

One of the jurors, Sullivan,[11] conducted an independent investigation about the Glock handgun used to murder Trinh. Tong contends that this juror misconduct denied him his Sixth Amendment rights.

The consideration of outside influence by a juror may impact a defendant's Sixth Amendment rights to jury by trial and to confront witnesses against him. *Parker v. Gladden*, 385 U.S. 363, 364 (1966). Outside intrusions upon the jury are analyzed for prejudicial impact. *United States v. Olano*, 507 U.S. 725, 738 (1993).

Sullivan, the juror in question, submitted an affidavit in connection with Tong's state habeas corpus proceeding in which she stated that she conducted her research after the trial concluded. SH at 164. She also stated that she did not share any information she obtained from her research with other jurors, and that her research had no effect on her deliberations. *Id.* at 164.

---

[11]     Juror Sullivan was the juror Tong attempted to strike after the trial court changed the voir dire procedure.

In response, Tong offers only a hearsay statement by his investigator to the effect that the juror told him that she conducted her research during jury deliberations on guilt-innocence. The state habeas court was not unreasonable in crediting the juror's affidavit over the hearsay statement of the investigator.

AEDPA deference notwithstanding, Tong fails to demonstrate any prejudicial impact of the juror's alleged misconduct. On federal habeas review, error is harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks and citation omitted). The burden of proving such injury is on the petitioner. *Id.* at 637.

Tong argues that the juror's research went to the heart of the case, concerning, as it did, Tong's claim that the gun fired accidentally as he jumped over the counter. As discussed in detail above, however, Tong's contention that he accidentally shot Trinh is contradicted (1) by his own alibi defense, and (2) by forensic evidence showing that Trinh was shot at point blank range. The evidence, completely apart from any improper research, shows either that Tong intentionally shot Trinh at point blank range, or that he was not at the crime scene at all. Under either scenario, the juror's research (if performed during the trial) did not have a substantial impact on the verdict.

### P.   <u>Cumulative Error</u>

Tong argues that, even if none of the alleged errors is itself sufficient to merit relief, the cumulative effect of all the errors served to deny him a fair trial. Even if each individual instance of alleged error is insufficient, standing alone, to justify relief, cumulative error may provide a basis for habeas relief if the cumulative effect of the errors was to deny the defendant

74

due process.  *See Derden v. McNeel*, 978 F.2d 1453, 1457-58 (5th Cir. 1992).  To reach the

level of a denial of due process, however, the errors must amount to

> the failure to observe that fundamental fairness essential to the very concept of
> justice.  In order to declare a denial of it we must find that the absence of that
> fairness fatally infected the trial; the acts complained of must be of such quality
> as necessarily prevent a fair trial.

*Lisenba v. California*, 314 U.S. 219, 236 (1941) (*quoted in Derden*, 978 F.2d at 1457).

As discussed in detail above, with the possible exception of Tong's *Brady* claims, Tong

fails to identify any error.  Because there is no error to accumulate, Tong cannot show that

cumulative error denied him a fair trial.

### Q.    Residual Doubt

In his final claim, Tong argues that the cumulative effect of the State's alleged

misconduct prevented the jurors from relying on residual doubt in reaching a sentencing

verdict.  The Supreme " Court has never held that a capital defendant has a constitutional right

to an instruction telling the jury to revisit the question of his identity as the murderer as a basis

for mitigation."  *Franklin v. Lynaugh*, 487 U.S. 164, 172–73 (1988).  The State's conduct did

not deprive Tong of a right he did not have.

## IV.   CERTIFICATE OF APPEALABILITY

Petitioner has not requested a certificate of appealability ("COA"), but this court may

determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander

v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic]

to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it

merely states that an appeal may not be taken without a certificate of appealability having been

issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds.  We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential

scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000).

This Court has carefully and exhaustively considered each of Petitioner's claims. While the issues Petitioner raises are clearly important and deserving of the closest scrutiny, this Court finds that each of the claims, with the exception of Tong's *Brady* claims, his claim that he was denied due process by the change in voir dire procedure, and his claim that counsel rendered ineffective assistance by failing to object to the general verdict, is foreclosed by clear, binding precedent.

With regard to the *Brady* claims, this Court will conduct further proceedings. While the Court believes that the voir dire and general verdict claims are barred by precedent, the issues raises serious due process questions that they deserve encouragement to proceed further.

With regard to the other claims, this court concludes that under controlling precedent, Petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As to those claims that have been dismissed on procedural grounds, this Court concludes that jurists of reason would not find it debatable whether the petition states valid grounds for relief and would not find it debatable whether this court is correct in its procedural determinations. This Court concludes that, with the exception of the voir dire claim, Petitioner is not entitled to a certificate of appealability on any of the claims dismissed by this order.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, it is **ORDERED** as follows:

1.      Respondent Lorie Davis' Motion for Summary Judgment (Doc. # 59) is **GRANTED IN PART**;

2.      Petitioner Chuong Dong Tong's Amended Petition for Writ of Habeas Corpus (Doc. # 57) is **DENIED** in all respects other than with regard to Tong's *Brady* claims;

3.      All claims other than Tong's *Brady* claims are **DISMISSED WITH PREJUDICE;**

4.      A certificate of appealability shall issue only as to Tong's claims concerning the change in voir dire procedure and counsel's failure to object to the general verdict;

5.      The Court will conduct an evidentiary hearing concerning Tong's *Brady* claims;

6.      The parties must confer and submit a joint report, on or before October 31, 2016, proposing a schedule for discovery (if any is needed), briefing, and a hearing on Tong's *Brady* claims; and

7.      Because the Court cannot proceed with any actions in this case until the parties have submitted a proposed schedule and engaged in discovery, if needed, this case is **STAYED** and **ADMINISTRATIVELY CLOSED** until further notice.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

SIGNED at Houston, Texas, this 30th day of September, 2016.

78

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE